JOSEPH D. BLAIS *et al.* vs. ROBERT S. FRANKLIN *et al.* Commrs. *et al.*

JULY 12, 1910.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1) *Construction of Statutes.*

The object of all construction and interpretation of statutes is to ascertain the meaning and intention of the legislature, that the same may be enforced. This meaning and intention must be first sought in the language of the statute, which must be interpreted literally, but if the language is ambiguous or is fairly susceptible of two or more interpretations, the intended meaning must be sought by the aid of all pertinent and admissible considerations; but the court can not, merely because it has a choice between two constructions, substitute for the will of the legislature its own ideas as to the justice, expediency, or policy of the law.

(2) *Construction of Statutes.*

Every statute is to be construed with reference to its intended scope, and the

purpose of the legislature in enacting it, and where the language used is ambiguous, or admits of more than one meaning, it is to be taken in such sense as will conform to the scope of the act and carry out its purpose.

(3)   *Same.*

Every statute is understood to contain by implication, if not by express terms, all such provisions as may be necessary to effectuate its object and purpose, or to make effective the rights, powers, privileges, or jurisdiction which it grants, and all such collateral consequences as may be fairly inferred from its terms.

(4)   *Same.   Grammar.*

Where there is ambiguity, rules of grammar will be disregarded where a too strict adherence would defeat the purpose of the legislature.

(5)   *Same.   Title of Act.*

The title of a statute can not control or vary the meaning of the enacting part, if the latter is unambiguous, but if there is doubt or obscurity in the body of the act, the title may be consulted as a guide to the probable meaning of the legislature.

(6)   *North Main Street Bridge Commission.*

In Public Laws, chapter 499, passed May 7, 1909 (the North Main street bridge commission), the words "the expense of all said work of reparation and construction," in section 5, refer to bridge work, and not to work done by or for the cities in the change of grade of their streets.

(7)   *Same.*

The court will interpret section 6 of said act, according to the apparent intention of the legislature, by treating the words "the commission," as impliedly understood in said section, so as to constitute the commission the body to determine and award the amounts to be paid by the cities, respectively.

(8)   *Same.*

The broad power to build a bridge includes all minor details, and the legislative intent to empower the commission to build a bridge is clear.

(9)   *Constitutional Law.   Delegation of Legislative Power.*

Public Laws, chapter 499, is not obnoxious to Cons. R. I., article IV. section 2, in that it delegates legislative power to the commission appointed thereunder for the construction of a bridge.

The legislature may properly delegate discretionary powers of an executive and administrative character to a commission.

The absence of any provision in the act limiting the cost of construction, does not render the act unconstitutional.

(10)   *State Debts.   Constitutional Law.*

Under Pub. Laws, cap. 499, no liability is imposed upon the State, but the legislature has specifically directed the payment of the expenses by the cities, and "State debts" can not be construed to include debts of municipalities, even though the incurring of such debts is directed or authorized by the

State.    Hence the act is not obnoxious to Cons. R. I. article IV, section 13.

(11)   *Constitutional Law.*

Public Laws, cap. 499, is not obnoxious to Cons. U. S. article XIV, of amend-
ments, section 1, nor to Cons. R. I., article I, section 10, in that by said act
property of a taxpayer is taken without due process of law.

The apportionment of the burden of expense in building the bridge was with-
in the discretion of the legislature, which may delegate to a commission the
authority to determine in what proportion, and by what towns, the expenses
shall be paid.

Blodgett J., dissents.

BILL IN EQUITY.    Heard on constitutional questions.

DUBOIS, C. J.    This is a proceeding in equity, wherein the
complainants, in the twenty-third, twenty-fourth, and twenty-
fifth paragraphs of their bill of complaint, raised certain con-
stitutional questions, which were certified to this court by the
Superior Court.    The respondents moved that the questions,
so raised and certified, be returned to the Superior Court.    But
after due consideration the motion was denied by this court,
for the reasons set forth in the opinion rendered in *Blais* v.
*Franklin*, 30 R. I. 413.    The case was so fully stated in said
opinion as to render unnecessary a re-statement thereof at
this time.    We will therefore only set out the three paragraphs
of the bill hereinbefore referred to, which read as follows:

"Twenty-third:    That in and by said act, viz.: Chapter 499
of the Public Laws passed at the January Session of the General
Assembly, A. D. 1909 hereinbefore mentioned there is no pro-
vision limiting the cost of the construction of said new bridge
and said foot-bridge and the removal of said old bridge and
there is no provision specifying the kind and style of bridge
for which the commissioners were to adopt plans or the load
it shall be capable of carrying or the traffic it shall accommo-
date and if said act should be construed to authorize said Com-
missioners to construct and to make a contract for the con-
struction of said new bridge and said foot-bridge and to re-
move said old bridge inasmuch as it does not limit the cost
and makes the foregoing provisions and therefore gives the Com-
missioners the right to fix the cost and the kind and size and

style it is a delegation by the General Assembly of a discretion which should have been exercised by the General Assembly and is not properly an administrative discretion but is a substantive matter of legislative discretion that the General Assembly cannot delegate and hence said act should be declared unconstitutional and repugnant to and in violation of Article IV Section 2 of the Constitution of Rhode Island and hence is null and void and should be so declared and said contract should be declared null and void and said Frederick E. Shaw should be enjoined both temporarily and permanently from proceeding under said contract and from building said new bridge and otherwise acting under said contract.

"Twenty-fourth. Said Commission has executed a purported contract with said Frederick E. Shaw to construct said new bridge for $72,856. This does not cover the entire cost of constructing said bridge but only the cost of constructing that part of said bridge that is described in said plans and specifications. Nor does it cover the land that must be purchased nor the cost of raising or lowering the grade of the highways leading thereto, nor the damages to owners abutting upon the highways upon either side of said bridge, nor the damages to riparian owners on account of the obstruction of the flow of water by said bridge and the construction thereof nor the expenses, fees and costs of said Commission, its engineers and the numerous attorneys and agents employed by it. Furthermore the Commissioners cannot give to the said Frederick E. Shaw the land upon which to build said bridge as it does not belong to them or to the State of Rhode Island or to either the Cities of Pawtucket and Central Falls and hence the said Frederick E. Shaw if said contract is a valid contract will be entitled to make an extra charge for the delay and loss to which he has been put by the said Commissioners and if he constructs said bridge in part upon private land as required by said contract and said plans and specifications, the portion of the bridge so constructed upon private land will belong to the respective owners of said land and if the said Commissioners or the State of Rhode Island or either of the Cities of

Pawtucket or Central Falls should later acquire such land by eminent domain or otherwise, that portion of said bridge upon such land would have to be paid for to the respective owners of such land. In the said contract made by said Commissioners and said Frederick E. Shaw it is provided that all work to be done under said contract shall be fully completed and performed on the part of said Frederick E. Shaw within 100 working days after the date fixed in a certain notice in writing provided that the time lost by stormy weather shall be added and your orators are informed and believe and therefore aver upon information and belief that on the 31st day of December, 1909 said notice had not been given and said date had not been fixed and whether said notice has since been given and said date fixed your orators have no knowledge or reasonable means of knowledge. Under said Chapter 499 the Cities of Pawtucket and Central Falls have to alter the grades of their highways at their own expense, the expense of the construction of said bridge has to be paid by said City of Pawtucket in the first instance and later said expense and the cost and expenses of said Commission is divided between said Cities of Central Falls and Pawtucket in the manner prescribed in said act. Such amount your orators are informed and believe and therefore aver upon information and belief will exceed $125,000. The express consent of the people of Rhode Island has not nor has the express consent of the people of Pawtucket and Central Falls been obtained to the incurrence of such indebtedness. So far as said Chapter 499 as claimed by said Commissioners authorizes said Commissioners to proceed with and to make said contract for the construction of said new bridge said Chapter 499 is unconstitutional and is repugnant to and in violation of Article IV Section 13 of the Constitution of Rhode Island and said contract is null and void and if said Chapter does not so authorize said Commissioners then said contract is null and void and in either case said Frederick E. Shaw should be enjoined from proceeding under and from building said bridge and otherwise acting under said contract.

"Twenty-fifth: Said Chapter 499 provides that the said Commissioners shall make plans for the raising or lowering of the grade of the highways leading to said new bridge, if in the opinion of said Commission such change is desirable, in which case said Cities of Pawtucket and Central Falls shall alter the grade of their highways to correspond with the grade of such new bridge without any limit as to the cost of such change. It further provides that in case the owner of any land abutting upon the highways on either side of said new bridge shall claim that such land has been damaged by any of the work provided herein to be done and takes certain steps he shall be awarded his damages and they shall be forthwith paid without stating by whom. It further provides that the expense of all said work of construction shall be paid by the City of Pawtucket in the first instance and that when the bridge shall be completed and the full cost of the construction shall have been ascertained, said City of Pawtucket shall file a full and detailed statement of said expenditure including the cost and expenses of said Commission and the amount of interest due to the City of Pawtucket for money advanced under said act in the office of the City Clerk in both the City of Pawtucket and the City of Central Falls, and after notice and hearing, the City of Pawtucket shall name the total amount expended by it under this act including the costs and expenses of this Commission and the interest due the said City on amounts paid, which each of said Cities shall pay, and the proportion of the same each shall pay. Neither City is given any hearing as to the expense of the work or its kind, size or style but they have to defray the expense. The City of Pawtucket determines how the total expense including the cost and expenses of said Commission shall be divided between the two Cities and each City pays said total expense and then its share of the total expense as determined by said City of Pawtucket although the City of Pawtucket has already paid the full expense. The Cities of Pawtucket and Central Falls are merely given a hearing upon the apportionment of such expense between them. Some of the provisions of said act are

impossible, others incoherent and unintelligible and others are inadequate to accomplish its purpose. For the above reasons and the other reasons appearing in this bill of complaint said Chapter 499 is unconstitutional and especially is repugnant to and in violation of Section 1 of Article XIV of the amendments to the Constitution of the United States and Section 10 of Article 1 of the Constitution of Rhode Island, and hence the said contract purporting to be made thereunder should be cancelled and annulled and declared null and void and the said Frederick E. Shaw should be enjoined both temporarily and permanently from proceeding under and from building said bridge under said contract."

We are of the opinion that three constitutional questions are thereby raised:

1. Do the provisions of Pub. Laws, cap. 499, passed May 7, 1909, delegate legislative power to the North Main Street Bridge Commission?

2. Does said chapter 499, create a State debt in excess of fifty thousand dollars without the consent of the people?

3. Does chapter 499, aforesaid, authorize the taking of the complainants' property without due process of law?

Before entering upon the consideration of the foregoing questions it is manifest that it is necessary to determine a preliminary question, namely: Whether said chapter 499 authorizes the commissioners to build a bridge or to make a contract for its construction. For if the statute confers upon them no authority to construct or cause to be constructed any bridge, the consideration of the constitutional questions becomes unnecessary.

In order to determine what the statute does authorize, it is necessary to consider its provisions. The act reads as follows:

"CHAPTER 499.

"AN ACT FOR THE APPOINTMENT OF A COMMISSION FOR THE ERECTION OF A BRIDGE BETWEEN THE CITIES OF PAWTUCKET AND CENTRAL FALLS.

"It is enacted by the General Assembly as follows:

"SECTION 1. Within thirty days after the passage of this

act the governor shall appoint three suitable and disinterested persons, and they and their successors are hereby constituted 'A commission for the erection of a bridge between the cities of Pawtucket and Central Falls over the Blackstone river, known as the North Main street bridge.'

"Any vacancy in said commission, by resignation or otherwise, shall be filled by the appointment of a suitable person by the governor.

"Sec. 2. Said commission is hereby authorized and empowered to determine the necessity for the reparation of the bridge now connecting the two cities on North Main street, or for the building of a new bridge at said location, and upon the determination thereof to adopt plans for the reparation of the present bridge or the erection of a new bridge.

"Sec. 3. Said commission is further authorized and empowered, upon determination of the necessity and advisability of repairing the present bridge or the construction of a new bridge at said location, to adopt suitable plans for said reparation or said new construction, and plans for the approaches and abutments thereto, and for the raising or lowering of the grade of the highways leading thereto, if in the opinion of said commission such change is desirable, in which case said cities of Pawtucket and Central Falls shall alter the grades of their highways to correspond with the grade of such new bridge.

"Sec. 4. In case the owner of any land abutting upon the highways on either side of said new bridge shall claim that such land has been damaged by any of the work provided herein to be done, and shall so certify to the superior court for the county of Providence within sixty days after the completion of said work, said court shall appoint three disinterested persons as commissioners, who shall, upon due notice and hearing, estimate and award the damages to such owner, and file in the office of the clerk of said court their appraisal of the damages by them awarded to such owner. Any person aggrieved by the award of said commissioners may, within three months after the filing of the appraisal aforesaid, appeal to

the superior court in said county from said award, for an appraisal of damages by said court, with or without a jury trial, as the appellant may elect, in the same manner as in the case of lands taken for highways, and the amount so awarded by said court shall be forthwith paid.

"SEC. 5.   The expenses of all said work of reparation or construction shall be paid by the city of Pawtucket, in the first instance, and the city council of said city is hereby authorized and directed to make all such appropriations as may from time to time be necessary for that purpose, and the said city is hereby authorized to hire from time to time, on the notes or bonds of the city, and on such terms and conditions as said city council shall prescribe, such sums of money, to an amount not exceeding the whole of the sum which said city of Pawtucket may be required to expend under any of the provisions of this act, and said city council shall provide for such sinking fund as may be necessary to meet such loans as may be made under this act; and all obligations which may be created under the authority of this act shall be excepted from the operation of section 21, chapter 36, of the General Laws, and all acts in amendment thereof and in addition thereto.

"SEC. 6.   When such bridge shall be repaired, or the construction thereof completed, and the full cost of such reparation or construction shall have been ascertained, said city of Pawtucket shall file a full and detailed statement, setting forth the amount of expenditure, including the costs and expenses of said commission, made by it pursuant to this act, and the amount of interest due to the city of Pawtucket for money advanced under this act, in the office of the city clerk in both the city of Pawtucket and the city of Central Falls, and upon the filing thereof shall, after due notice to all parties interested therein and a hearing thereon at a time and place by said commission named in said notice, determine, decree, award, and name the total amount expended by said city of Pawtucket under this act, including the costs and expenses of this commission and the interest due the said city on amounts paid, which each of said cities of Pawtucket and Central Falls shall pay, and the proportion of

the same which each of said cities shall pay. The report of said commission shall be made in writing and filed in the office of the clerk of the superior court for the county of Providence, and a copy thereof, certified by said clerk, shall be forthwith transmitted to said cities of Pawtucket and Central Falls, and said court shall, within thirty days after the filing of said report, unless sufficient cause be shown to the contrary, upon exceptions filed by either of said parties, after a trial of said exceptions with or without a jury as the party excepting may elect, accept and confirm said report and enter judgment thereon, or shall confirm and enter judgment upon said report, as revised and amended by said court, and said report so confirmed shall thereupon be binding upon the said parties, and execution in favor of said city of Pawtucket on said judgment against said city of Central Falls may be issued and collected as other judgments against towns.

"SEC. 7. The said city of Central Falls is hereby authorized to hire such sums of money as may be necessary to satisfy said judgment or execution, upon such terms and conditions and on such time as the city council thereof shall determine.

"SEC. 8. This act shall take effect upon its passage."

In support of their contention that the act in question does not authorize the commission to construct any bridge, the complainants mainly rely upon the suggestions made by Mr. Justice Blodgett in *Newell* v. *Franklin*, 30 R. I. p. 266, in his then concurring opinion, which will, for the purposes of this case, become his now dissenting opinion. In the last-mentioned case the petitioners, for a writ of *certiorari*, attempted to call in question the constitutionality of Pub. Laws, chapter 499, aforesaid. A majority of the court then said, p. 265: "There is nothing in this petition that raises such a question and thereby necessitates such an examination of the statute for the purpose of determining its constitutionality; and therefore we do not regard the question as properly raised in this proceeding, and decline to consider it. It is our duty, however unpleasant, to consider such question, when properly raised. But until the constitutionality of an act of the General Assembly has been

directly brought in question, it is entitled to the benefit of the presumption of constitutionality." Neither was it necessary to the determination of that case to ascertain whether said chapter 499 gave authority to the commissioners to build the bridge therein referred to. Therefore the remarks made upon that subject in the concurring opinion alluded to are *obiter dicta*, and the matter can not be considered as *res adjudicata.* Considered, however, as the dissenting opinion in the present case, where the question is before us, the same is entitled to all the weight contained in the reasons given for the conclusions reached therein. Whether, as the learned judge therein supposes, the act in question was modelled upon a former act, as may well happen, for precedents are doubtless sought for in legislative as well as judicial proceedings, is of little consequence. All goods are not up to the sample. Many copies are not equal to the originals. Doubtless there may be occasions where the meaning of a sentence containing some word deemed to be ambiguous in an act might be aided by comparison with another sentence containing the word in some former act. But to prove the dissimilarity of the two acts is of little value in ascertaining the legislative intent. To show that a child does not resemble his father is unimportant, when the question of paternity is not in issue. It has been well said that the object of all construction and interpretation of statutes is to ascertain the meaning and intention of the legislature, to the end that the same may be enforced. This meaning and intention must be sought first of all in the language of the statute itself. For it must be presumed that the means employed by the legislature to express its will are adequate to the purpose and do express that will correctly. If the language of the statute is plain and free from ambiguity, and expresses a single, definite, and sensible meaning, that meaning is conclusively presumed to be the meaning which the legislature intended to convey. In other words, the statute must be interpreted literally. If the language of the statute is ambiguous, or lacks precision, or is fairly susceptible of two or more interpretations, the intended meaning of it must be sought by the aid of all pertinent and

admissible considerations. But here, as before, the object of the search is the meaning and intention of the legislature, and the court is not at liberty, merely because it has a choice between two constructions, to substitute for the will of the legislature its own ideas as to the justice, expediency, or policy

(2) of the law. Black. Interp. Laws, sections 24, 25, 26, and 27, and cases there cited. Every statute is to be construed with reference to its intended scope and the purpose of the legislature in enacting it; and where the language used is ambiguous, or admits of more than one meaning, it is to be taken in such sense as will conform to the scope of the act and carry out the purpose of the statute. *Ibid.* section 30. Every statute is understood

(3) to contain, by implication, if not by its express terms, all such provisions as may be necessary to effectuate its object and purpose, or to make effective the rights, powers, privileges, or jurisdiction which it grants, and also all such collateral and subsidiary consequences as may be fairly and logically inferred from its terms. *Id.* section 33 and cases cited. "Whenever powers, privileges, or property are granted by a statute, everything indispensable to their engagement or exercise is impliedly granted also, as it would be in a grant between private persons." Endlich Interp. Stats, section 418. "All those minor directions and details which are not specified in the statute, but are involved in its general terms will be filled in, by implication, whenever it is necessary in order to give the law an effective operation. This is not adding to the act provisions which the legislature did not contemplate, but evolving from its broad terms those particular provisions which are necessarily included within its general purpose and tenor." Black. Interp. Laws, p.

(4) 69. Primarily a statute is to be interpreted according to the ordinary meaning of its words and the proper grammatical effect of their arrangement in the act. But if there is any ambiguity, or if there is room for more than one interpretation, the rules of grammar will be disregarded where a too strict adherence to them would raise a repugnance or absurdity or would defeat the purpose of the legislature. *Id.* section 34 and cases cited. The title of a statute can not control or vary the

meaning of the enacting part, if the latter is plain and unambiguous.   But if there is doubt or obscurity in the body of the act, the title may be consulted, as a guide to the probable meaning of the legislature, and should be accorded some weight in the interpretation.   *Ibid.* section 76 and cases cited.   Let us, then seek to ascertain the intention of the legislature in enacting chapter 499 aforesaid.   Its title is "An act for the appointment of a commission for the erection of a bridge between the cities of Pawtucket and Central Falls."   The first section of the act is in harmony with the title and provides for the executive appointment of three persons to constitute such a commission for the erection of a bridge between said cities over the Blackstone river, known as the North Main street bridge.'  Said section also provides for filling vacancies that may occur in said commission.   Section 2 confers upon the commission the authority to determine the necessity for the reparation of the existing bridge connecting the two cities, or for the building of a new bridge at said location, and upon the determination thereof to adopt plans either for the reparation of the old bridge or for the erection of a new bridge, as the case may be, in accordance with its decision in the premises.

Section 3 empowers the board, after they shall have decided to repair the old bridge or to construct a new one at said location, to adopt, not only suitable plans for such reparation or new construction, which authority had already been conferred upon them by the provisions of section 2, but also plans for the approaches and abutments and plans for raising or lowering the grade of the highways leading thereto if they deem such change desirable, *in which case the cities shall alter the grades of their highways to correspond with the grade of such new bridge.*

Section 4 provides for appraisal and payment of land damages caused by any change of grade of the highways made by said cities to conform to the grade of the new bridge.   In the minority opinion, hereinbefore referred to, this section is criticised as follows:   "Section four of the act is similar in its provisions to section three of the Red Bridge act in the matter of damages caused to an abutting owner and the appeal from the award of

appraisers appointed by the superior court and a trial by jury, but differs in this respect, that 'the amount so awarded by said court shall be forthwith paid,' but does not specify by whom it shall be paid. It is obviously impossible in the case of a claim for damages by an abutting owner caused by a change of grade, under section three, by the city of Central Falls, that the court can award that the damages should be paid by the city of Pawtucket, who is no party to such a suit, even if there were valid reason why the city of Pawtucket should in any event pay damage for that which it has not caused. But section five provides that 'The expense of *all* said work of reparation and construction shall be paid by the city of Pawtucket in the first instance, and the city council of said city is hereby authorized and *directed* to make all such appropriations as may from time to time be necessary for that purpose;' and, after providing for the issue of bonds of the city of Pawtucket for this purpose, and for a sinking fund for them, continues: 'and all obligations which may be created under the authority of this act shall be exempted from the operation of section 21, chapter 30 of the General Laws, and all acts in amendment thereof and in addition thereto,' which is the only statute prohibiting the creation of municipal indebtedness in excess of three per cent. of the taxable property of the town or city. It will be observed here that in this respect this act differs from the former act in that it makes no provision of any kind for the payment of damages to abutting owners."

We can not agree with this construction. Section 5 has nothing to do with the payment of claims made under section 4; the words "The expense of all said work of reparation and construction" (to be paid by the city of Pawtucket in the first instance) refer to work of *reparation and construction* done under contract or under the orders of said commission, in other words, bridge work; and not to work done by or for said cities in the alteration of the grades of their streets, in other words, highway work. It is perfectly apparent, from a reading of section 3, that the cities of Pawtucket and Central Falls, and not the commission, are required by the legislature to alter the grades of

their highways to conform to the grade of the new bridge; and therefore, in case of any claim brought under section 4 aforesaid, for damages caused by such change of grade made by either of said cities, prosecuted to final judgment by the owner of any land abutting upon the highways aforesaid, the amount awarded to the claimant by the court should be forthwith paid by the. city which made such change of grade. The complainants in the twenty-fourth paragraph of their bill, would seem to admit this: "Under said chapter 499 the cities of Pawtucket and Central Falls have to alter the grades of their highways at their own expense."

Section 5 provides for the payment of the expense of all said work of reparation or construction by the city of Pawtucket in the first instance, whose city council is directed to make the necessary appropriations therefor, and the city is authorized to hire, on its notes or bonds, the money required for these purposes, and to provide for a sinking fund. Moreover, its obligations, under said authority, are excepted from the statutory prohibition that no town shall incur any debt in excess of three per centum of the taxable property of said town, including its indebtedness on the tenth day of April, 1878.

(7)    The provisions of section 6 have been analyzed in the minority opinion, hereinbefore referred to (p. 270), as follows: "It is contended by the respondents that the cost of construction is to be apportioned by the commission, under section six of the act, the provisions of which can only be adequately set forth by a citation of a part of it: 'When such bridge shall be repaired, or the construction thereof completed, and the full cost of such reparation or construction shall have been ascertained, said city of Pawtucket shall file a full and detailed statement, setting forth the amount of expenditure, including the cost and expenses of said commission, made by it pursuant to this act, and the amount of interest due to the city of Pawtucket for money advanced under this act, in the office of the city clerk in both the city of Pawtucket and the city of Central Falls, and upon the filing thereof shall, after due notice to all parties interested therein and a hearing thereon at a time and place by

said commission named in said notice, determine, decree, award, and name the total amount expended by said city of Pawtucket under this act, including the costs and expenses of this commission, and the interest due the said city on amounts paid, which each of said cities of Pawtucket and Central Falls shall pay, and the proportion of the same which each of said cities shall pay,' Then follows a provision for a report of the commissioners to the Superior Court, and provides for exceptions to the report and determination of the same by the court.

" As to the first clause of this section, it is to be observed that the grammatical subject of the sentence concluding with the words, 'shall,' etc., 'determine, decree, award, and name the total amount expended by said city of Pawtucket under this act, including the costs and expenses of this commission and the interest due the said city on amounts paid, which each of said cities of Pawtucket and Central Falls shall pay, and the proportion of the same which each of said cities shall pay,' is not 'the commission,' which, indeed, is directed to hold a hearing thereon, but is 'said city of Pawtucket,'—so that, while the commission is to hear the parties, the city of Pawtucket is to 'determine, decree, and award.'

" But it is further provided that the city shall so 'decree determine, and award' 'the total amount expended by said city of Pawtucket,' under the act, and that 'each of said cities of Pawtucket and Central Falls shall pay' such total amount. To whom Pawtucket is to pay again, after once having paid the contractor, is not apparent; and if each one of the cities is to pay 'the total amount expended by said city of Pawtucket,' it is obvious that such amount is to be twice paid, and that the language is wholly unintelligible. There seems to be no escape from this futile conclusion in view of the concluding sentence, which is perfectly clear: '*and* the *proportion* of the same which each of said cities shall pay.'

" Again, the Red Bridge act included a provision in section six thereof, *supra*, that ' the expenses and fees of the commissioners of apportionment allowed by said court shall be paid in such manner and by such parties as the said court shall deter-

mine and award,' This act contains no provision for the payment of any fees or compensation to the commissioners, but merely includes 'the *costs* and *expenses* of this commission,' which are obviously very different matters; and, equally obviously, do not include counsel fees, since the attorney-general is by law their legal adviser, and has appeared in this case in their behalf, and also do not include any fees or compensation to the commissioners, for their services. Even if it were possible to so construe 'costs and expenses' as to include compensation to the commissioners for their services, there is no provision in the act for the fixing of the amount of their charges; indeed, on this construction, the amount must be fixed by the commissioners themselves, and they are thus to be held to be authorized to charge what they please, and these amounts must first have been actually paid by the city of Pawtucket before the apportionment, since upon this construction they are specifically included in computing 'the total amount expended by said city of Pawtucket,' *supra.* Moreover, even upon exceptions to the report before the court, there seems to be no jurisdiction given to the court to revise or allow such charges for compensation, since the only judgment which the court is in terms empowered to enter and issue execution upon is a judgment in favor of the city of Pawtucket against the city of Central Falls, and is limited to a revision of the apportionment, and jurisdiction is not extended to a consideration of 'the total amount expended by said city of Pawtucket' prior thereto. The mere statement of such a contention as this is sufficient."

Our views of the intention of the legislature, as expressed and implied in the provisions of section 6, do not coincide with the grammatical construction so strictly adhered to. We have endeavored to ascertain the spirit of the law, and have refused to be bound by the mere letter; "for the letter killeth, but the spirit giveth life." In these days of stenography and type-writing much work may be done, and a great deal of it correctly done; but in the transcription it is easy to drop a word or two or to duplicate a phrase or two, and even the argus-eyed com-

mittee on engrossed bills may fail to detect some clerical error. Even Jupiter sometimes nods. Especially may this be true in the "last day of the last session of the legislature." But the legislature has as much power and right to legislate on the last day as on the first, and their conduct in the premises is no more open to censure than that of this court in rendering decisions and opinions on the last days of its session.

The dissenting opinion has made it perfectly plain that to construe the section literally makes the action of the Assembly in that respect seem incoherent, unintelligible, and inadequate, —a condition of affairs not lightly to be presumed against a co-ordinate branch of the government. It is unreasonable to suppose that the legislature intended that one of the parties in interest should act as a judge in the cause wherein it is interested. If the city of Pawtucket is to determine, decree, award, and name, after a hearing, the proportion of the amount expended which each of said cities shall pay, why shall the commission name the time and place for the hearing? Cities have no extra-territorial jurisdiction. Cities can not choose places. Cities must remain at home or cease to be. Their limitations are fixed. It is customary to give to the body, having power to hear and determine, the right to fix the time and place for the hearing. What reason appears for a departure from such reasonable custom in the act under consideration? We can discover none. But in addition to this it appears that the report of said commission shall be made in writing and filed in the office of the clerk of the Superior Court, whereof a copy shall be forwarded to each of said cities, and the court shall accept and affirm said report and enter judgment, and execution on said judgment in favor of Pawtucket against Central Falls may be issued. What report? A report, by the commission, of the findings of the city of Pawtucket at the hearing, the time, and place of which was fixed by the commission? The city of Pawtucket is able to make a report or statement; indeed, it is required to in the early part of section 6. Why should the commission be required to file a report, which is to be the basis of a judgment against the city of Central Falls, of a hearing,

determination, decree, and award at which it was not required to be present or take part? It is too ridiculous to be seriously considered. When an unintentional omission is so apparent, and can so readily be rectified; when a chaotic condition can so readily be reduced to order; and when the manifest intention of the legislature can be made perfectly clear, we ought no longer to hesitate, but should boldly interpret the section according to the apparent intention of the legislature. This we think can be done by treating "the commission," impliedly understood, as if it was the subject of the sentence concluding with the words "shall," etc., "determine, decree, award, and name the total amount expended by said city of Pawtucket," etc., "which each of said cities shall pay and the proportion of the same which each of said cities shall pay." Under the rules hereinbefore referred to we feel perfectly justified in thus giving expression to the spirit of the law and the intention of the makers thereof. It was entirely unnecessary to provide for the removal of the old bridge if a new bridge was to be built on its site, for it would be physically impossible to construct a new bridge upon the site of the old without previously removing the old. Neither was it necessary specifically to provide for temporary stagings, foot-bridges, or other structures necessary or useful in modern bridge building. The broad power to build a bridge includes all minor details. In the opinion of the majority of the court the legislative intent to empower the commission to build a bridge is perfectly clear. In addition to the title and the sections already commented upon, the provisions of section 6 are illuminating. It contemplates the work as done, the bridge as completed. By whom is the work therein deemed to have been done? There is no suggestion that any other person or persons were to perform it, and in the full and detailed statement of the city of Pawtucket, setting forth the amount of expenditure, there is to be included *the cost and expenses of said commission, made by it pursuant to this act.* Cost and expenses for what, if not incurred in the reparation or building of the bridge? But in addition thereto it appears that, upon the filing of the statement by the city of Pawtucket

in the office of the city clerk in each of said cities, more work is imposed upon the commission; for they will have to give notice and a hearing, and then determine, decree, award, and name the proportion of the total amount, expended by said city of Pawtucket, which each of said cities shall pay. The report of said commission (so determining, decreeing, awarding, and naming the proportion of the total amount so expended to be paid by each of the cities) is to be made in writing and filed in the office of the clerk of the Superior Court. The legislative intent to cause the reparation of the old bridge or the building of a new bridge is clearly expressed or implied therein, and, in our opinion, it is difficult to read the act, with the determination of endeavoring to ascertain the intention of the General Assembly therefrom, without coming to this conclusion. When so read, the act is not incoherent, unintelligible, or inadequate, but is sufficient for the purpose.

Having thus decided that said chapter 499 does authorize the commission to build the bridge, we will consider the constitutional questions raised:

(9) First: Do the provisions of Pub. Laws, cap. 499, passed May 7, 1909, delegate legislative power to the North Main Street Bridge Commission?

The constitutional provision which the complainants claim is infringed by said act is contained in Constitution, R. I. art. IV, sec. 2, which reads as follows: "The legislative power, under this constitution, shall be vested in two houses, the one to be called the senate, the other the house of representatives; and both together the general assembly. The concurrence of the two houses shall be necessary to the enactment of laws. The style of their laws shall be, It is enacted by the General Assembly as follows:"

The complainants aver that the act is obnoxious to the constitutional provisions aforesaid in the following particulars: That in said act "there is no provision limiting the cost of the construction of said new bridge and said foot-bridge and the removal of said old bridge and there is no provision specifying the kind and style of bridge for which the Commissioners were

to adopt plans or the load it shall be capable of carrying or the traffic it shall accommodate   .   .   .   and therefore gives the Commissioners the right to fix the cost and the kind and size and style, it is a delegation by the General Assembly of the discretion which should have been exercised by the General Assembly and is not properly an administrative discretion but is a substantive matter of legislative discretion that the General Assembly cannot delegate."

Of the grounds above specified we do not regard any worthy of serious consideration except that relating to the absence of a provision in the act limiting the cost of the work therein prescribed.   While the act confers on the commissioners certain authority and discretion as to their execution of the law, it does not confer on, or delegate to, the commissioners the power to make the law itself, nor to use any discretion as to what the law shall be.   Such powers as are given to the commissioners by said act are discretionary powers of an executive and administrative character.   And while it is true that the legislature might properly, in the first instance, have determined by its own judgment certain matters left to the commissioners, yet the legislature may intrust such matter to other departments or officers, or to a body or commission created by it.

That the highways and bridges are under the control of the legislature is elementary.   The only discretion, beyond that usually given to commissioners in such cases, was that of ascertaining whether the old bridge could be advantageously repaired, or whether a new one was necessary.   After having decided this matter, the powers remaining to the commissioners were such as are usually given in like cases.   Such discretionary powers are executive; for, having decided the matter aforesaid, further duties, by the operation of the law itself, are to be performed in accordance with the provisions of the act.

Questions of the kind, style, and strength of a bridge are not legislative in their character, and are such matters of detail as may well be left to the sound discretion of any body of men competent to serve upon a commission appointed by the governor, under the act of the General Assembly, to undertake the

construction of a bridge over a river between two cities, to take the place of an existing bridge, unless said commission elects to repair the same. The kind, style, and strength of the proposed bridge must largely be determined by the location, fixed by the General Assembly, as the place where such bridge must be erected. As it is stated that the bridge is to connect two public highways in the two cities named, the traffic need not be further specified. The strength and capacity of the bridge ought largely to depend upon the traffic it is expected to accommodate, not only at the present time, but also in the future. The General Assembly required a bridge to be built. It is to be presumed a sufficient bridge is thereby intended by the legislature. But the question of strength is an engineering, and not a legislative, question. Dismissing, therefore, all grounds other than that of the absence of any provision limiting the cost of reparation or construction provided for in said act,— is that a sufficient ground for attacking the constitutionality of the same?

A similar question was raised in the case of *Brayton* v. *Fall River*, 124 Mass. 95, and the opinion therein, by Colt, J., is enlightening: "The city of Fall River, and the towns of Somerset and Swansea, object to the acceptance of an award made by commissioners appointed by this court to apportion and assess upon the county of Bristol, and the cities and towns therein, a part of the cost of a bridge constructed for both highway and railway purposes, across Taunton Great River, by the Old Colony and Newport Railway Company, according to a plan approved by the railroad commissioners, and under the provisions of the St. of 1872, c. 295.

"There is no express requirement in the statute that the doings of the commissioners shall be returned into court. But it results from necessary implication, arising out of the nature of the duties which are to be performed, that such return should be made, in order that the doings of the commissioners may be confirmed, when no sufficient cause is shown to the contrary. *Hingham & Quincy Bridge* v. *Norfolk*, 6 Allen, 353.

"The act in question gives to the railroad corporation the

right to build a bridge, adapted for both kinds of travel, upon a plan to be approved by the railroad commissioners, and with a draw approved by the harbor commissioners, and directs that one fourth of the 'equitable cost' of the same be paid by the county to the corporation, and that, on the completion of the bridge, that portion thereof adapted to highway purposes shall thereupon become a public highway.

"The objection that this act is unconstitutional cannot be sustained. From the earliest times, laws have been passed providing for the construction, support and maintenance of public roads and bridges, and for the distribution of the expense and burden of the same upon the cities and towns benefited. It is said that such laws are authorized by those clauses of the Constitution which give to the Legislature the right to impose taxes, and the power to enact such wholesome and reasonable laws as they shall judge to be for the good and welfare of the Commonwealth. The manner in which this power shall be exercised, and the means and instrumentalities to be employed, are largely within the discretion of the Legislature. It belongs exclusively to that body to determine whether the benefit to be secured in any given case is sufficient to warrant the cost, and this is not a question for the court. The Legislature may itself determine in the first instance the question of public necessity and convenience, or may leave it to the adjudication of designated officers and tribunals. The power is most commonly and extensively exercised in the mode prescribed by general laws, administered by established tribunals or boards of public officers; but in many cases the end is accomplished by special legislation, with or without the aid of commissioners. In all cases, however, the work of actual construction has been committed to private citizens, or to corporate bodies, public or private; the power to exercise the right of eminent domain may even be so delegated. *Dorgan* v. *Boston*, 12 Allen, 223; *Hingham & Quincy Bridge* v. *Norfolk*, cited above. *Salem Turnpike* v. *Essex*, 100 Mass. 282. *Haverhill Bridge Proprietors* v. *County Commissioners*, 103 Mass. 120; *Eastern Rail-*

road v. *Boston & Maine Railroad*, 111 Mass. 125; *North-hampton Bridge Case*, 116 Mass. 442.

"The strength of the respondents' objection is, not that the Legislature compels the county, cities and towns to build a bridge over Taunton River, but that it compels them to pay a part of the cost by way of contribution to a railroad corporation for building the same. This is indeed an unusual mode of proceeding in such cases; but to employ a railroad corporation to build a public highway or bridge is no more objectionable than to employ any other corporation or any private person to do the same thing. The arguments of the learned counsel for the respondents are addressed to the expediency rather than to the constitutionality of the act. There can be no invasion of constitutional rights, if the means employed in the exercise of the granted power are reasonable, and the cost and burden assumed are distributed in such manner as to be reasonable and proportional. The proceedings under this act are no more to be condemned on principle than those which are so frequently had under laws authorizing bridges already built to be converted into public highways, with an apportionment by commissioners, of the expense incurred, upon the counties and towns benefited. The structure contemplated by the act is required to be prepared for two different modes of travel, upon a plan approved by an impartial board of commissioners. It must be presumed that the Legislature intended to adjudge that the specified one fourth part of the equitable cost would fairly represent the value of the bridge to the public for highway travel only.

"We cannot say that, in any respect, this act transcends the limit within which legislative power in this direction may be exercised."

Section 1 of chapter 295, approved May 2, 1872, of the Acts and Resolves of the Commonwealth of Massachusetts, referred to in the foregoing opinion, reads as follows: "The Old Colony and Newport Railway Company may construct a bridge across Taunton Great River, from some point near Slade's ferry in Fall River, to some point near Slade's ferry in Somerset; and

said bridge shall be adapted to both highway and railway purposes, and in the construction thereof said company shall be subject to the provisions of section four of chapter one hundred and forty-nine of the acts of the year eighteen hundred and sixty-six; and said bridge shall be provided with such a draw, not exceeding sixty feet wide, as the harbor commissioners may direct. The board of railroad commissioners shall approve the plans for said bridge before work thereon is commenced, and said bridge shall be constructed to their approval. The supreme judicial court, upon the application of said company,. or of any ten citizens of the county of Bristol, shall appoint three special commissioners, who shall assess from time to time, as the work progresses, one-fourth part of the equitable cost of said bridge upon the county of Bristol, the same to be paid to said company, and upon the completion of said bridge that portion thereof adapted to highway purposes shall thereupon become a public road and highway." And Mass. Stats. cap. 149, approved April 12, 1866, § 4, therein referred to, relates to supervision by the board of harbor commissioners. ·

There is no limitation, upon the cost of the bridge so to be constructed under said act and the only qualification of the cost is contained in the phrase "one fourth part of the *equitable cost* of said bridge upon the county of Bristol." The word *equitable* would be implied in any event, and we do not see that the legislative intent is in any way strengthened by its being so expressed.

There are many legislative precedents in Rhode Island for the appointment of commissions to perform certain works, without limitation upon their power to expend money. Under an act passed at the June session, 1844, commissioners were appointed to make such repairs to the State House in the county of Bristol, as they shall deem necessary, without limit fixed as to the cost and expense of the same. At the January session, 1845, commissioners were appointed to ascertain and settle the boundary line between Massachusetts and Rhode Island, with authority to employ such surveyor and other persons as they may find necessary, and no limit was fixed as

to cost and expense to be incurred.   At the January session, 1854, the governor was authorized to appoint a trustee to collaborate with trustees to be appointed by other States for the construction and maintenance of a monument in Philadelphia to commemorate the declaration of American independence,—the expense of the trustee appointed by this State to be defrayed by the General Assembly.   Upon receiving the report of the board of trustees of the design, plan, material, and expense of said monument, and estimate of the proportion to be contributed by this State, the General Assembly was to make provision for the payment of the same in such instalments as said board of trustees shall have declared to be necessary, and no limit fixed as to how much money they should spend.

At the January session, 1866, an act was passed authorizing the town of South Kingstown to build a bridge across Narrow river, which did not limit the expense to which the town might go.

At the January session, 1868, a resolution was adopted appointing a committee to procure rooms for the accommodation of the courts of Providence county, and no limit was fixed as to the amount to be expended.

At the January session, 1883, "The Washington Bridge Act" was passed.   The commissioners appointed by the governor in this case were given full power to determine the size and, without limit, the cost of the bridge, and the State appropriated $50,000.00 as its share of the expense, the rest of the expense to be borne by the city of Providence, East Providence, and other towns that are beneficially interested.

At the January session, 1888, Albert R. Greene, Charles J. Arms, and such civil engineeers as they may employ, were appointed a commission to run out, establish, and make upon the ground, by suitable monuments, the boundary line between the towns of Warwick and East Greenwich, and the expenses incident to the execution of the duties thereby imposed were to be paid equally by said towns, and no limit was fixed as to the expense and cost of said work.

Chapter 1332, "The Red Bridge Act," so-called, passed

June 12, 1894, directed the city of Providence forthwith to build a bridge, without limitation as to the cost thereof.

At the January session, 1905, a resolution was passed authorizing the sheriff of Providence county to provide temporary quarters for the courts of said county and to furnish the same; and the auditor is directed to pay for the rent and furnishings of such offices and quarters so procured by the sheriff upon his orders, and no limit was fixed as to the cost thereof.

The case of *State* v. *Budge, et al.,* 14 No. Dak. 532, cited in the minority opinion, may readily be distinguished from the case at bar. In that case the court stated that the legislature created a capitol commission "whose duty it shall be to remodel and reconstruct upon its present site the capitol building of the state of North Dakota, at Bismarck, and erect a suitable residence for the governor on the lots now owned by the state according to the provision of this act. The law contains no directions as to how much shall be expended for each of said buildings. That is left entirely to the commissioners," and, continuing, on p. 540, the court says: "In this case the commission has unlimited discretion as to what the residence shall cost, and what the capitol shall cost, within the aggregate cost of both, which may, perhaps, be said to be limited to $600,000, because the aggregate sum of the certificates of indebtedness against the funds with which the buildings are to paid for is limited to that sum. The commission has absolute power under this law to fix the limits of the cost of each of said buildings. They finally determine what sums shall be used for each building. We think that such discretion should have been exercised by the legislature. It is not properly an administrative discretion. What the several buildings shall cost should have been limited by the act, as it is a substantive matter of legislative discretion that the legislature cannot delegate."

In the case of *State* v. *Budge, et al., supra,* the amount that could be expended by the commissioners was fixed at $600,000. Therefore the amount was not the question at issue. The question was, as stated by the court (p. 537): "Whether the

power to determine the relative amounts of the fund derived from the sale of the lands granted by congress that shall be spent for a capitol building and for a governor's residence is a matter of legislative discretion or pertains to administrative questions is the question to be determined." The court says: (p. 539) "The language of sec. 17 of the enabling act is conclusive upon the question. When that act provides, 'and the lands granted by this section shall be held, appropriated and disposed of exclusively for the purposes herein mentioned in such manner as the legislatures of the respective states may severally provide,' no room is left for debate on the question that the legislature shall determine when these funds shall be used for public buildings and what these public buildings shall be. The power to control these lands and the funds derived therefrom was delegated by congress to the legislature, and that delegation was accepted and confirmed in the constitution by its adoption by the people. Hence it is clear that the general disposition of these funds for use in public buildings must be done by the legislature." In other words, a delegated power can not be redelegated. The above case is clearly not in point.

(10) Under the act in this case the commission is to repair a bridge, or build another on the same site, across a river. The difference in the work required of the two commissions is obvious. The duty of preparing a home for the legislature of a State, and another for its governor, is vastly different from that of building a highway-bridge across a little river. The possibilities of extravagance in the former case are so much greater than could be apprehended in the latter that there is little ground for comparison between the two. The ideas of ordinary men as to what would be a suitable State House to erect and what would be appropriate for an executive mansion in their own State, with its glorious history and present and future prospects, would be likely to find expression in architecture of an expensive type. But the same men, in considering the question—what would be a suitable bridge to replace an old one, would not be likely to allow the same play to their imaginations. Many men could safely be trusted to know what might be proper in

respect to a bridge and who ought not to be given unlimited power to build State Houses, executive mansions, and the like. There is more necessity for particularity and restraint in the former than in the latter.

For these reasons we are of the opinion that the first constitutional question must be answered in the negative.

The second question, whether the act aforesaid creates a State debt in excess of fifty thousand dollars without the consent of the people, must also receive a negative answer.

Article IV, section 13 of the constitution of Rhode Island, is as follows: "The General Assembly shall have no power hereafter, without the express consent of the people, to incur state debts to an amount exceeding fifty thousand dollars, except in time of war, or in case of insurrection or invasion; nor shall they in any case without such consent, pledge the faith of the state for the payment of the obligations of others. This section shall not be construed to refer to any money that may be deposited with this state by the government of the United States."

In the first place, no State debt of any amount whatever is in terms thereby created. Secondly, there is no sum mentioned, so that it is impossible to ascertain from an inspection of the act the amount of indebtedness that will result from the construction of the bridge therein authorized to be built. The General Assembly has not only the right to control public bridges, but also the further right to provide for the payment of the expense of reparation and construction out of the funds of cities and towns beneficially interested. The general power of the legislature for the appropriation of city funds for the purpose of paying for local improvements, over which the legislature has the right of control, has been passed upon and sustained in *Horton* v. *City of Newport*, 27 R. I. 283. In that case the court approved the principle that the legislature has full power over the revenues of a municipality created by it, at least so far as relates to matters within legislative control, and may direct the application of such revenues to such purposes as it deems appropriate, for the public welfare. A public bridge, as a part

of the highway system of the State, is subject to a right of control in the General Assembly—Elliott on Roads and Streets, §§ 31–33.

An examination of the provisions of Public Laws, Chapter 499, shows that the debt authorized thereby is not a State debt within the customary meaning of that term. It is ordinarily supposed that the identity of a debtor is fixed by reference to the person or body liable to the payment of the debt.

In *Rodman* v. *Munson*, 13 Barb. 188, it was said by Barculo, J.: "Those who contend that the act done does not create a debt, seem, in some degree, to confound individual and governmental liabilities; or at least to disregard, occasionally, the plain distinction between them. Thus Mr. Webster says, in his opinion, ' to contract a debt is in the general sense of the phrase, to incur a liability for the payment of money.' (Senate Documents of 1851, No. 69.) And with this definition he proceeds to demonstrate that the law does not create a debt either 'in law or equity.' The conclusion follows almost as a matter of course, if the premises are sound, and the term 'liability' has the novel significance of an obligation which can be enforced.

"But when we speak of state debts, we do not refer to obligations which can be enforced by legal process, either in a court of 'law or equity.' For in this sense, a state is never indebted. A sovereign cannot be coerced by judgment and execution. All its contracts, however solemnly made, rest solely upon the public faith, and, when this fails, we hear of repudiation, which unfortunately for the honor of this country, has become too well understood in some portions of it. While, therefore, we say of an individual, that he is indebted, when he is bound to pay money for an obligation which can be enforced by legal process, we can only predicate this of a state when there is a claim for money which, in justice, the state ought to pay or cause to be paid." In the same case, in the language of Morse, J. (p. 192): "A state debt never contained in its definition any other obligation than the moral one of good faith in calling forth and applying the resources of the state to meet its engagements. In the ordinary sense, as between man and man,

there is no legal obligation upon the state which can be enforced against the will of the debtor. A state debt always meant, as it still means, a moral duty on the part of the proper organs of the government to faithfully administer and call forth so much of the resources of the state as may be necessary to comply with its undertakings," and as was said by S. B. Strong, J. (p. 198): "A state debt, as it is generally understood, is such a pecuniary demand as would, under the attending circumstances, be valid against an individual. The obligation to pay, under the circumstances, is perfect, and cannot be disregarded without a violation of the public faith and that sense of justice which should ever govern the action of states, as well as of individuals." Such is not the case in Public Laws, chapter 499. No liability of any kind is imposed upon the State. On the other hand, the General Assembly specifically directed the payment of the expense of all work of reparation or construction, by the city of Pawtucket in the first instance, and ultimately by the cities of Pawtucket and Central Falls after apportionment under the provisions of said act.

Under the above cited provisions, chapter 499 authorizes the incurring of a debt or obligation which can be enforced against the cities of Pawtucket and Central Falls by appropriate legal process. That a debt of this character is not a "State debt" in its technical sense is evident from a consideration of the nature of a State obligation. The term "State debts" can not be construed to include debts of cities, even though the incurring of such debts is directed or authorized by the State.

This case presents the following situation: The legislature, in the exercise of its constitutional right, has authorized the imposing upon the cities of Pawtucket and Central Falls of a debt which, by the specific terms of the act, is an obligation against said cities and not against the State. Is the term "State debt" to be construed as applying to debts of cities, when authorized or directed by the legislature, as well as to actual obligations against the State? Such an interpretation of article IV, section 13 of the constitution would be contrary to the plain intent of said section, contrary to the weight of

authority, and in violation of well-established rules of constitutional construction. The argument of the complainants that, 'The whole includes a part" ignores the clear distinction between the State and a city as distinct governmental agencies. Although the city is a political subdivision of the State, exercising delegated authority, it is in its organization and function a distinct entity. It would be as reasonable to designate the debts of the State as city debts because the city has to bear its proportion of the burdens, as it would be to admit the contention of the complainants and fasten the character of a State debt upon an obligation binding only upon the city. It is no answer to say that in the present case the debt is directed and authorized by the State. If such reasoning were valid, all city debts would be State debts, since all city debts are incurred by the exercise of delegated powers, express or implied.

The distinction between the State and a city is well expressed by Baldwin, J., in *Pattison* v. *Yuba County*, 13 Cal. 175, 182, as follows: "The argument, more fully developed by the learned counsel, seems to be this: The State is forbidden by the 8th Article of the Constitution, to create debts over three hundred thousand dollars, or to loan its credit, etc.; the counties are component parts of the State; the State cannot authorize the creation of this debt by its separate subdivisions any more than by itself as a whole. If this argument were sound, it would seem to follow that all indebtedness of every sort, incurred by all the counties of the State—the State having exceeded its privileged limit—is void. But the radical error of the argument is, this provision only applies to the State as a corporation—as a political sovereign, represented by her lawmaking power. As such corporation, or sovereign being, she has no subdivisions, for sovereignty is not divisible. She may have political subdivisions—that is, she may permit a portion of her powers of government to be exercised by local agents, who, of course, are her subordinates. But politically considered, geographical or political departments are no more the State, or a part of the State, than a man's land, or his agent, is a part of himself. The intent of this clause of the Consti-

tution is plain enough; it was designed as a check on legislation, and such legislation as might create a charge upon the property of the entire State. But it is not only unwarranted by the words of the Constitution to suppose that counties were included in this inhibition, but it might well have been foreseen that the provision would prove extremely embarrassing, if it did not entirely stop the operations of those local governments. All of them, or nearly all, we believe, have been obliged to go in debt to support themselves; and, besides, the restriction would be wholly inpracticable, for how ascertain from time to time, whether the aggregate of all this indebtedness passed the limit, and when, or whether, by payments or otherwise, returned within it again? For the question of the validity of any contract or debt would depend upon the general balance of State and county debits or credits. Many cases have come before this court involving the validity of these debts, but the point has never before been taken; and we think there is not enough of plausibility in it to justify a more detailed exposition of its fallacy."

The restriction of the limitation to State debts excludes the application of article IV, section 13, to city debts. In construing the provision of a constitution, the court is engaged in the interpretation of an instrument which is the deliberate, solemn expression, by the people, of the fundamental law of the State. From the character of the instrument it is to be presumed that its language is carefully weighed, and that its terms imply a certain definite meaning. As stated in *Greencastle* v. *Black*, 5 Ind. 566, 570: "Constitutions import the utmost discrimination in the use of language." This principle of construction is of especial force in the case of constitutional provisions of a specific nature, as in the present case. So it seems that if the framers of the constitution had intended to limit the power of the legislature in the incurring of *all* debts, the word "State" would have been omitted. Briefly, the term "*State*" must be presumed to have its ordinary and natural meaning.

In *Hallenbeck* v. *Hahn*, 2 Neb. 399, the court said: "Neither

can any objection against this legislation be found in that other section of the same article (Sect. 4) which provides: 'For the purpose of defraying extraordinary expenditures, the State may contract *public* debts; but such debts shall never in the aggregate exceed fifty thousand dollars.' This, like the other section, means what it says,—the state, and not counties and cities. *Expressio unius est exclusio alterius.* There is not a county in the state, nor a city of any pretensions, but has incurred indebtedness of greater or less amount,— some a great way beyond the limit here fixed. There is, perhaps, never a time that the State proper is not up to this limitation of indebtedness; and it cannot be supposed that it was the purpose to limit the aggregate of indebtedness of all the school districts, counties, and cities, at any one time, to fifty thousand dollars! But counsel had not the presumption to urge this; and I will not pursue the discussion of that which is patent upon it face. It needs not authority: but I cite *Board of County Commissioners of the County of Leavenworth* v. *Miller,* 7 Kansas 479; *Cass* v. *Dillion,* 2 Ohio St. 612–616; *Slack* v. *R. R. Co.,* 13 *B. Monroe,* 1; *Dubuque* v. *R. R. Co.,* 4 G. Greene, 1; *Prettyman* v. *Sups.,* 19 Ill. 406, 411; *City of Aurora* v. *West.* 9 Ind. 77, 79; *Clark* v. *City of Janesville,* 10 Wis. 136, 170; Cooley's Con. Lim. 216–219."

In *Cass* v. *Dillon,* 2 Ohio St. 607, 614, the court considered certain provisions of the constitution forbidding the State to incur debts, with certain exceptions, and from contracting any debt for purposes of internal improvement. The court, Thurman, J., said: "The 6th section of Article 12, is in these words: 'The State shall never contract any debt for purposes of internal improvement.' Does this relate to the subdivisions of the State? If so, they may prove quite inefficient to accomplish a chief end of their creation. A flood washes away a county road and endangers a county bridge. Upon the above construction, one must remain unrepaired, and the other unprotected, if there are no funds in the county treasury. Nothing can be done until taxes are laid and collected, though, in the meantime, the injury may increase a hundred fold, and all

travel be interrrupted. The streets or wharves or water works of a city may need repair; but none can be made unless there are taxes in the public purse. Is such the design of the constitution? We do not think so. The natural and obvious meaning of these several sections applies their limitation to the State alone, and not to her subdivisions. And that the State only was intended, is further shown by the fact, that the constitution constantly keeps in view the distinction between her and her parts. The idea, now contended for, that each limitation upon her power, is necessarily a limitation upon the power of her subdivisions, does not seem to have entered the minds of the convention. . . . In short, the idea that limitations of the power of the State, as such, operate as limitations upon the power of each of her subdivisions, is not the theory upon which the constitution was written. It was not supposed by its framers, that the mathematical axiom that ' the greater includes the less' would be an invariable canon of construction in considering their work. . . . In general, at least, when the constitution speaks of the State, the whole state, in her political capacity, and not her subdivisions, is intended."

In *Leavenworth County* v. *Miller*, 7 Kan. 479, at p. 497, the court said: "In closing this branch of the case, we would say that the constitution means just what it says. It says the *State* shall never be a party in carrying on any works of internal improvement, and it means the *State*, and not *Leavenworth County*, and to hold that this restriction upon the State is also upon counties, cities, etc., is to put words in the constitution which its framers omitted, and to overturn a well settled rule of constitutional and statutory construction. *Expressio unius exclusio alterius.*" Constitutional limitations upon the power of the State to incur debts have generally been held to apply to general public debts of the State and not to the debts of its political subdivisions.

The legislature may not only *permit* cities and towns to incur indebtedness for the construction, reparation, and maintenance of their highways and bridges, but also may *require* them to incur such indebtedness by ordering them to do what the legis-

lature deems necessary to be done in the premises, and the indebtedness thus incurred, whether the same be incurred voluntarily or by such compulsion, will be the debt of the municipality by which it is incurred. Take the very case of the bridge in question: if the cities of Pawtucket and Central Falls had elected to repair the North Main street bridge and had incurred indebtedness thereby no one would have claimed that such a debt was a State debt. But because they have been compelled to have done for them that which they should have done for themselves, and an indebtedness arises which they are required to pay, how does that become a State debt? We fail to perceive that there is any difference.

For these reasons we are of the opinion that no State debt of any amount is created by said act.

(11) The third and last question asked, namely, Does the act in question authorize the taking of the complainants' property without due process of law: directs our attention to article XIV of the amendments to the constitution of the United States, section 1, which reads as follows: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." And also to article I, section 10 of the constitution of Rhode Island, which is as follows: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury; to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining them in his favor, to have the assistance of counsel in his defence, and shall be at liberty to speak for himself; nor shall he be deprived of life, liberty, or property, unless by the judgment of his peers, or the law of the land."

The point relied upon by the complainants in support of

this contention is that "Neither party in interest is heard as to the necessity of building a bridge nor as to the expense of the work or the kind, size or style of the bridge. The only hearing the Cities of Pawtucket and Central Falls get is as to the apportionment of the expense." There is no merit in this contention. No notice is required to be given property owners or municipal corporations respecting those matters which the legislature itself determines. *Spencer* v. *Merchant*, 125 U. S. 353; *Meier* v. *St. Louis*, 180 Mo. 391.

As was said by Mr. Justice Brewer in *Williams* v. *Eggleston*, 170 U. S. 304, at p. 310, *et seq*: "It is further contended that the acts of May 24, 1895, and June 28, 1895, are in conflict with that portion of the Fourteenth Amendment which forbids the depriving of any person of life, liberty or property without due process of law, because, first, 'they deprive the town of the right to perform its town duties by officers of their own choosing which is contrary to the settled practice and law of the State, and arbitrarily destroys the right which those towns had before the constitution of Connecticut was adopted and which was not taken away by that instrument; and, secondly, because the acts provide for arbitrarily taking the property of the inhabitants of Glastonbury without proper notice of any proceeding under which the property is to be taken and without opportunity to be heard.' Whatever may have been the practice of the State in the past it cannot be doubted that the power of the legislature over all local municipal corporations is unlimited save by the restrictions of the state and Federal constitutions; and, that these acts in no way violate any provision of the state constitution is settled by the decision of the state Supreme Court. *Backus* v. *Fort Street Union Company*, 169 U. S. 557, 566, and cases cited. It is true that there was a division of opinion between the members of the state Supreme Court, but such division, although a close one, does not prevent the opinion of the majority from becoming the decision of the court, and as such conclusive upon us. When the state court decides that municipal corporations within the territorial limits of the State are subject to the control of

the state legislature, and that its act in creating for certain purposes a new corporation, and merging therein five separate towns, was valid, this court cannot hold that the State court was mistaken in its construction of the state constitution or in its declaration as to the extent of the power of the legislature over municipal corporations.

"Neither can it be doubted that, if the state constitution does not prohibit, the legislature, speaking generally, may create a new taxing district, determine what territory shall belong to such district and what property shall be considered as benefited by a proposed amendment. And in so doing it is not compelled to give notice to the parties resident within the territory or permit a hearing before itself, one of its committees, or any other tribunal, as to the question whether the property so included within the taxing district is in fact benefited. *Spencer* v. *Merchant*, 125 U. S. 345, 346; *Parsons* v. *District of Columbia*, 170 U. S. 45. It should be noticed that no question is presented as to the necessity of notice before any property tax is cast upon the citizen. The only question is as to the power of the legislature to cast the burden of this improvement upon the five towns, towns which may have been already judicially determined to be towns benefited thereby. Although the apportionment made between the towns was not that determined by the judicial proceedings, yet it was one of which certainly the town of Glastonbury cannot complain, for the judicial apportionment was as to it reduced by the legislative act. In casting this burden upon the towns the legislature did not proceed without a hearing from the towns, for their representatives were in the legislature and took part in the proceedings by which the act was passed. So they had an opportunity to be heard, if such hearing was necessary, prior to the enactment of the law."

Chapter 499 provides for an equitable apportionment of the cost of construction between the cities of Pawtucket and Central Falls. Under section 6 of chapter 499, the commission shall determine and apportion the total expense of construction between the two cities. The act provides that, after the

filing of a full and detailed statement of the expenditure the commission shall give notice of the time and place of the hearing upon the question of apportionment. A further hearing is provided by exceptions to the Superior Court, and trial thereon in said court.

The apportionment of the burden of expense incurred in construction of a bridge beneficial to two or more counties or towns is within the discretion of the legislature. In *Scituate* v. *Weymouth*, 108 Mass. 128, 132, the court said: "The legislature had the power to determine the mode in which the public burden of maintaining those bridges should be borne in the future, and it was competent for them to delegate to commissions, appointed in any manner they saw fit, the authority to determine by what towns and in what proportions the expenses should be paid."

These considerations are decisive of the question.

Having thus decided the constitutional questions certified to us by the Superior Court, the papers in the cause will be sent back to the Superior Court, with our decision certified thereon for further proceedings.

BLODGETT, J., dissenting. Inasmuch as the questions submitted are submitted upon the provisions of cap. 499, Pub. Laws, as actually enacted by the General Assembly and not upon other or different language than is therein contained, I remain of the opinion heretofore expressed by me in *Newell* v. *Franklin*, 30 R. I. 266.

*John N. Butman, Waterman, Curran and Hunt,* for complainants.

*Bassett & Raymond, Irving Champlin, James Harris,* for respondent commissioners.

*Barney & Lee,* for respondent, Frederick E. Shaw.