## OPINION TO THE GOVERNOR.
### JULY 21, 1937.

*To His Excellency Robert E. Quinn, Governor of the State of Rhode Island and Providence Plantations:*

We have received from Your Excellency a request for our written opinion upon certain questions of law in accordance with the provisions of sec. 2 of article XII of amendments to the constitution of this state. The questions are propounded to us in the following form:

### I.

"As a matter of statutory construction, does Chapter 2536 of the Public Laws, enacted by the General Assembly in April, 1937, authorize the issuance of Bridge Revenue Bonds of the State of Rhode Island in the name of the state acting by and through the Jamestown Bridge Commission in the form attached hereto, or does such Chapter require that the bonds thereby authorized be issued as bonds of the Jamestown Bridge Commission in its own name?

### II.

"As a matter of constitutional interpretation, if said Chapter 2536 does authorize the issuance of Bridge Revenue Bonds of the State of Rhode Island in the name of the State acting by and through the Jamestown Bridge Commission, would the issuance of such bonds be the incurring of a state debt in violation of the prohibition contained in Sec. 13 of Article IV of the Constitution of Rhode Island?

### III.

"As a matter of statutory construction, are the provisions of paragraph (b) of Sec. 17 of said Chapter 2536 with reference to excessive tolls, subject to the provisions of Sec. 12 of said Chapter which requires the Jamestown Bridge Commission to fix, charge and collect tolls for the use of the bridge and to fix and adjust such tolls so as to provide a fund, sufficient with any other funds available for the purpose, to pay such bonds and the interest thereon and to provide an additional fund to pay the cost of maintaining, repairing and operating the bridge?

The first of these questions, in the form presented, raises an issue primarily as to whether or not the form of the proposed bond is authorized by the provisions of chapter 2536 and, secondarily, whether or not said chapter is to be construed as authorizing bonds to be issued only in the name of the Jamestown Bridge Commission. In other words, are bonds issued in the name of the state of Rhode Island, as proposed in the form attached to your letter, in violation of said chapter and therefore illegal? If this question is answered in the affirmative, it will be unnecessary to consider the matter contained in question II. Question III, however will still require consideration.

These questions raise issues of very great importance to the integrity and good faith of the state. They are worthy of the most careful consideration and we have tried, in the limited space of time at our disposal and amid the pressure of other business pending before us, to give them the study and attention they merit. In doing so, we have been assisted by a brief, filed with our permission, on behalf of the bridge commission. This brief fully presents arguments and cites authorities in support of the propriety of the proposed form of bond, and also of the constitutionality of chapter 2536 under a construction of that statute which would justify the issuance of such proposed form of bond. It further discusses and presents arguments in support of the view that sec. 17 is subject to sec. 12. We have not, however, had the benefit of the views of counsel in support of a contrary position. Nevertheless, we have given such a contrary position serious study and reflection, and have refrained from communicating this opinion to you until such study and reflection convinced us that the views to which we finally came are correct.

Our conclusion is that the proposed form of bond is not authorized by Chapter 2536. Our reasons for this view may be briefly stated.

It will be noted that this proposed form of bond is entitled "State of Rhode Island Bridge Revenue 4¼% bond",

and that immediately underneath this title, printed in very much smaller type than that used in setting out the terms and conditions of the bond, appears the following statement enclosed in parentheses:

"(Neither the state nor any political subdivision thereof, shall be obligated to pay this bond or the interest thereon, except from revenues of the bridge and ferry mentioned therein, and neither the faith, credit nor taxing power of the state or any political subdivision thereof is pledged to the payment of the principal of this bond or interest thereon.)

Among other things, the bond expressly declares at the outset. that "The State of Rhode Island and Providence Plantations, by the Jamestown Bridge Commission as an agency thereof, for value received, hereby promises to pay solely from the special fund provided therefor as hereinafter set forth," etc. Further along it also states: "This bond is one of a duly authorized issue of bonds known as State of Rhode Island Bridge Revenue 4¼% Bonds . . . ." And finally, the testimonium clause of the bond concludes in the following form: "IN WITNESS WHEREOF, the State of Rhode Island and Providence Plantations, under the authority aforesaid, has caused this bond to be signed by the Chairman of the Jamestown Bridge Commission, an agency of the State, under the seal of the Commission, and attested . . . ."

On the face of it, this language undeniably conveys the impression that this bond is, in certain particulars, an obligation of the State of Rhode Island. Notwithstanding the explanatory statement printed in small type beneath the title, investors in these bonds would be justified in assuming that the state had promised to pay these bonds and the interest thereon from the revenue accruing from the collection of tolls for the use of the bridge, and that such revenue would be received by the state and properly conserved by it to meet its promise of payment, as expressed in the bond. To put it differently, would not such investors be warranted in looking to the state itself to perform this obli-

gation *pro tanto,* if it appeared or could be shown that the revenues of the bridge had been misapplied or wasted and that as a result of such failure to properly conserve such revenues, the bondholders were deprived of their income? We think so.

We are told, however, that the act expressly declares the bridge commission to be an agency of the state. (sec. 3) This is true, but that declaration does not thereby vest it with the power and authority to enter into obligations in the name of the state. The cities and towns of the state are, by force of much of the authority which they exercise within their corporate limits, agencies of the state, but it has never been held that they thereby obtained the right to use the name of the state in entering into obligations pursuant to the exercise of essential governmental powers of the state. Such agencies of the state customarily obligate themselves in their own names in issuing bonds to enable them to obtain necessary funds for such purposes. Although they act in the exercise of such powers as agencies of the state in a certain limited sense, they do not contract obligations in the name of the state or for the state but in their own proper corporate names and capacities as authorized so to do. Even where such agencies are specifically authorized and directed by the state to incur debts for such purposes, the debt is not a "State Debt" and the state *is* not obligated in any way. *Blais* v. *Franklin,* 31 R. I. 95, 125. The mere declaration then in the present act that the bridge commission shall be deemed to be an agency of the state cannot by itself be construed to give the commission the right to issue obligations in the name of the state.

If such a right is given to the commission, we must look for it in language clearly expressed in the statute or necessarily implied. We cannot find any such language in the statute. On the contrary, the general scheme and purpose of the statute points in the direction of making the commission solely responsible for the construction, maintenance and operation of the bridge and especially for the financial

administration and control thereof. For these purposes, the act clothes the commission with substantially all the attributes of a distinct legal entity, separate and apart from the state. It is not necessary to labor this point as sec. 3 of the chapter clearly discloses that the general assembly intended that the commission should act in its own name, and not for any purpose whatsoever in the name of the state. The chapter gives the commission full power to act for itself and gives it no power to bind the state in any manner whatsoever, directly, indirectly or contingently. If the legislature intended to authorize the commission to contract in the name of the state, it would have specifically said so, in view of the positive language which it used in denying the commission the power to obligate the state in any way.

Under the provisions of said sec. 3, the Jamestown Bridge Commission is set up by the general assembly to all intents and purposes as a public corporation, or at least a quasi-public corporation. It is given a name and a seal, and then by that name it is authorized to "sue and be sued, plead and be impleaded, *contract and be contracted with.*" (italics ours) In addition, the power of eminent domain has been expressly delegated to it, and all property acquired or purchased by it, together with the income therefrom, is made exempt from all taxation within the state.

We think the general assembly, in conferring on the commission such plenary powers, intended to enable the commission to do all things necessary for carrying out the purpose of financing the construction of the proposed bridge as well as for the maintenance and operation of it. Nowhere does it appear in the act that it was intended that the state as such should have anything to do with either financing or constructing the bridge, or with the administration and control of it after it was constructed and in operation. The full and explicit authority to perform all these duties is delegated to the commission, and the act distinctly and expressly authorizes the commission to contract in its own name as above pointed out. Therefore, there is no justifi-

cation for the implication that the commission is authorized to issue bonds in the name of the state, nor is such implication reasonable, necessary or proper.

Probably the most important contract the commission will ever make will be with those who will lend the necessary funds for the construction of the bridge, that is, with the bondholders. Such contract ought to be entered into by the commission solely on its own responsibility and hence in its own name. That is what, in our opinion, the act clearly intends.

The fact that the title of the act describes the bonds authorized to be issued thereunder as "Bridge Revenue Bonds of the State" is not important, nor is it important that elsewhere within the body of the act a similar expression is used. The title of a statute cannot control or vary the meaning of the enacting part, if the latter is plain and unambiguous. *Blais* v. *Franklin, supra,* at 106. Only where there is doubt or obscurity in the body of the act may the title be considered, and then only as a guide of some weight as to the probable intention of the legislature. The present act by its terms leaves no doubt of the intention of the legislature, and the use of the expressions above alluded to do not tend to obscure its meaning. Such expressions ought not to be construed to indicate that the legislature intended that these bonds, which cannot legally obligate the state in any way whatsoever, must or even may be entitled State of Rhode Island bonds. The general scheme and scope of the act as a whole negatives any such legislative intent, and in our opinion the purpose of the legislature in enacting it is clear.

A substantial compliance with the provisions of sec. 6 of the act, entitled "Bridge Revenue Bonds", requires that the title of such bonds shall be consistent with the manner and form of their issuance, as authorized by said section. By that section it is provided that: "The commission is hereby authorized to provide, by resolution, for the issuance of such bonds . . . . The bonds shall be signed by the *chair-*

*man of the commission* and the *official seal of the commission* shall be affixed thereto and attested by the secretary and treasurer of the commission." (italics ours)

In our opinion it is not consistent for bonds thus issued and executed to be entitled "State of Rhode Island Bonds" and to conclude with a testimonium clause that the state of Rhode Island has caused such bonds to be signed and executed. Furthermore, we are of the opinion that the correct designation of such bonds, under the statute authorizing them to be issued, as well as a designation that would reasonably apprise the investor of the true nature of the security he was purchasing, would be "Jamestown Bridge Commission Bridge Revenue 4¼% bond."

This construction, in our opinion, is a reasonable one and gives effect to the statute by avoiding the possibility of unconstitutionality. An opposite construction would seriously raise that question and even though such a construction were as reasonable as the one which we have given above, it would be our duty to reject it conformably to the well-established rule that, where two different constructions of an act are reasonable, and one of them will, and the other will not, raise a serious question of the constitutionality of the act, the former should be rejected, and the latter adopted.

Moreover, we desire to state that we are of the opinion that the constitutionality of the act does not arise only because we have given to the act a statutory construction that gives the fullest effect to expressions repeatedly made throughout the act, and more particularly in sec. 9, as follows: "Notwithstanding any provision of this act, the commission shall have no power to pledge the credit of the state of Rhode Island, the town of Jamestown or of any political subdivision of the state or to create any debt of the state or of said town or of any political subdivision of the state. The issuance of bridge revenue bonds under the provisions of this act shall not directly or indirectly or contingently obligate the state or said town or any political subdivision of the state to levy or to collect any form of taxation what-

ever therefor or to make any appropriation for their payment."

As said above, we are of the opinion that the general scheme and scope of the act negatives any legislative intent that the bonds could be issued by the commission as state bonds or in the name of the state even without sec. 9, but to our minds, the language of that section above quoted makes it perfectly clear that the commission has no power to issue state bonds or to issue bonds in the name of the state, or to pledge the credit of the state to secure the payment of such bonds in any way whatever.

We desire to say further, that we construe sec. 18, authorizing the issuance of Bridge Revenue Refunding Bonds, to be subject to the same conditions and limitations as the Bridge Revenue Bonds, notwithstanding that such section refers to such refunding bonds as "bridge revenue refunding bonds of the state," and also refers to "the duties of the state . . . in respect to the same." Only under such a construction are we satisfied that the question of constitutionality does not arise. The issuance of either class of bonds in the proposed form attached to your letter would, under our construction of the statute, be illegal. From any of the viewpoints above considered, therefore, we are constrained to answer the first part of question I in the negative, and the second part of said question in the affirmative.

In view of the above answer to question I, it becomes unnecessary to answer question II.

Question III raises the issue of the legal effect if any, of the provision of paragraph (b) of sec. 17, in view of the authority to fix tolls, as vested in the bridge commission under sec. 12. We are of the opinion that both sections may stand and be given effect. They are not necessarily inconsistent with each other.

Under the provisions of sec. 12, the bridge commission is vested with the duty and authority to fix the tolls for the use of the bridge, in order to provide a fund with which to pay the bonds and the interest thereon. As the only

security which the bondholders will have for the repayment of the funds which they will lend to the commission is the net revenue accruing from the collection of tolls for the use of the bridge, the fixing of such tolls becomes a matter in which the bondholders would have a vital interest. The general assembly has recognized this fact in sec. 15 of the act and has provided the bondholders and the trustee with special remedies for the enforcement of the duty imposed on the commission to fix, charge and collect the tolls for the use of the bridge.

The authority of the commission to fix the tolls under these circumstances appears to be exclusive. However, it does not follow that there is no room for the exercise of the authority vested in the division of public utilities by paragraph (b) of sec. 17. By that paragraph the division is empowered to determine, upon application of the attorney general or of any one hundred electors of the state, whether or not tolls fixed and charged by the commission are so excessive as to be against the public interest.

The exercise of such power by the division, resulting in a finding that the tolls so charged are excessive to that extent, cannot operate to reduce the tolls, unless the commission is willing to accept the division's finding and itself reduce the tolls accordingly. The final decision in this matter rests with the commission. The only effect of such a finding on the part of the division would be to deprive the bridge commission, and those beneficially interested in the bridge as creditors, of the benefit of the special monopoly granted by the statute in favor of the bridge, if, within thirty days of such finding, the tolls are not reduced by the commission by the amount of the excess found by the division.

Section 17 of the act prohibits, during the life of the bonds, the construction or operation of any other bridge or ferry from Conanicut Island, that is, from the town of Jamestown, to the western part of the State of Rhode Island, that is, to the mainland, either by the state or any person or corporation, as long as the bridge is maintained continuously open

496

to public travel and the tolls are not found to be excessive by the division of public utilities in the manner above described. This, in effect, is the grant of a monopoly, and the conditions attached to it were, in our opinion, intended by the legislature as a check on any possible abuse of such exclusive privilege against the public interest. The second condition of sec. 17 set out in paragraph (b) is therefore not subject to the authority granted to the bridge commission in sec. 12.

There is no reason why the division of public utilities cannot make a finding in the exercise of its authority under said paragraph (b) without interfering in any way with the right or obstructing the duty of the bridge commission to fix tolls for the benefit of the bondholders. If a difference should occur between the division and the commission as to whether the tolls charged are so excessive as to be against the public interest, and if the bondholders should deem themselves aggrieved by the finding of the division, the commission, such bondholders, or the trustee would be entitled to a judicial review of such finding.

There is no good reason then for holding sec. 17 subject to sec. 12, and we therefore answer question III in the negative.

EDMUND W. FLYNN,
WILLIAM W. MOSS,
ANTONIO A. CAPOTOSTO,
HUGH B. BAKER,
FRANCIS B. CONDON.